**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

KEVIN AUSTIN,

               Plaintiff,

               v.

CITY OF CHICAGO,

               Defendant.

Case No. 14-cv-9823

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Kevin Austin worked for Defendant City of Chicago intermittently until his most recent termination in July 2014. Plaintiff alleges that Defendant fired him because of his race and in retaliation for protected activity, and brings claims for discrimination and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. [26]. Defendant moved for summary judgment. [66]. For the reasons explained below, this Court grants Defendant's motion.

## I. Background

### A. Local Rule 56.1 and Evidentiary Rules

The following facts come from Defendant's Local Rule 56.1 statement of material facts [65], and Plaintiff's Local Rule 56.1 statement of additional facts [69].[1]

Local Rule 56.1 requires the non-movant to file a concise response to each of

---

[1] In this discussion, "DSOF" refers to Defendant's statement of undisputed material facts [65], and "PSAF" refers to Plaintiff's statement of additional material facts [69]. "R. DSOF" refers to Plaintiff's responses to Defendant's statement of facts, [69]. References to additional filings are by docket entry number.

the movant's statements using "specific references" to the record to support any denial of the movant's facts. *See Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). General denials are "insufficient" to rebut a statement of fact and may be disregarded. *Id.* At summary judgment, courts "will not consider any additional facts" included in a party's response, but rely only upon those contained in that party's statement of facts and statement of additional facts. *LaSalvia v. City of Evanston,* 806 F. Supp. 2d 1043, 1045 (N.D. Ill. 2011) (citing *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005)). Finally, if materials cited to support a denial fail to "clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation." *Malec*, 191 F.R.D. at 584. If a party inadequately responds to an opponent's Rule 56.1 statement, the court may deem the opponent's factual allegations admitted. *Id.*

Applying these rules, this Court disregards Plaintiff's responses to paragraphs 10, 14, 28, 30, 32–35, 41, 43, 44, 52, 54, 60, 62, 63–65, and 71–74 of Defendant's statement of facts. In each of these responses, Plaintiff either fails to cite specific record evidence to justify his denial or cites irrelevant facts without providing an explanation. *See* R. DSOF. This Court deems Defendant's corresponding statements of fact admitted. *See Malec*, 191 F.R.D. at 584.

### B.    Plaintiff's Claim

Defendant first hired Plaintiff, an African-American man, in July 1998 as a laborer in the Department of Streets and Sanitation (DSS). DSOF ¶¶ 1, 28. In 2006, Defendant fired Plaintiff and placed him on the Ineligible for Rehire (IFR)

list. *Id*. ¶¶ 27–29. Defendant hired Plaintiff for the second time in 2012 and fired him again in 2014. *Id*. ¶¶ 36, 47. Plaintiff claims that Defendant's stated reason for his second firing—that Defendant became aware of Plaintiff's IFR status—was pretextual and that he was actually fired because of his race and in retaliation for the internal complaints of discrimination he made to Defendant. *See id*. ¶ 7; [26].

### C.   Plaintiff's First Termination

Defendant first fired Plaintiff in November 2006, following a report from the Chicago Office of the Inspector General (OIG) about Plaintiff's misconduct. *Id*. ¶¶ 28, 29. The OIG found that Plaintiff possessed a stolen U-Haul truck in 2005, and did not disclose a previous conviction for a different crime on his original employment application in 1998. *Id.* These acts violated Personnel Rule XVIII, Section 1, paragraphs 15 and 50, which prohibit any illegal acts by City employees, and Personnel Rule XVII, Section 1, paragraph 6, which prohibits failing "to disclose any information requested or providing a false or misleading answer" in any "document or application provided by the City." *See* [65-3] at 51, 55; [65-5] at 125. Plaintiff's application also asked, without qualification: "Have you ever been convicted of any crime?" *See* [65-5] at 124. The OIG recommended that Plaintiff be terminated and "never be rehired." DSOF ¶ 28; [65-5] at 125.

Plaintiff contested his discharge. DSOF ¶ 30. In February 2007, the City's Personnel Board held a full evidentiary hearing into Plaintiff's termination, at which Plaintiff was represented by counsel and presented evidence. *Id*. The Board determined that Plaintiff had, in fact, possessed a stolen U-Haul, in violation of

criminal statutes and the City's personnel rules, and affirmed Plaintiff's termination on that basis.  *Id*.; [65-7] at 186–96.

In August 2007, about nine months after his first firing, Plaintiff received a letter from Christopher Owen, the City's Deputy Commissioner for the Department of Human Resources (DHR), informing Plaintiff that his termination was "for cause," making him ineligible for future employment with the City.  DSOF ¶ 32; [65-5] at 29.  When Plaintiff inquired about his eligibility for rehire in 2010, DHR Recruiting Analyst Christina Batorski informed Plaintiff that he was "ineligible for re-employment with the City of Chicago permanently."  *See* DSOF ¶ 34; [65-7] at 184.

DHR maintains a database of its employee records (the CHIPPS database).  DSOF ¶ 13.  The CHIPPS database listed Plaintiff's race, as did his criminal background check form in 2012.  R. DSOF ¶ 53.  Since 2011, DHR has included information in the CHIPPS system about employees who, due to the circumstances of their resignation or discharge from City employment, are coded as IFR, either indefinitely or for a set period.  [65-6] at 26–31, 63–64; [65-7] at 21–22.  Before 2011, DHR maintained the IFR information in an Excel spreadsheet.  [65-7] at 22.  To place an employee on the IFR list, Owen would "pull the information related to the termination" and "write up a quick memo" to the DHR commissioner, who at the time of Plaintiff's 2006 discharge was Jackie King.  [65-5] at 31.  Owen wrote such a memo to King after Plaintiff's termination, which King approved before Defendant sent the August 2007 letter to Plaintiff.  DSOF ¶ 32.

### D. Plaintiff's Second Period of Employment

DSS rehired Plaintiff in September 2012, first as a seasonal pool motor truck driver (pool MTD) and then as a full-time pool MTD from April 2013 through July 2014. DSOF ¶¶ 36, 39. Plaintiff claims that as of his second hiring, Batorski—still working for DHR—knew his race. R. DSOF ¶ 53. As a pool MTD, Plaintiff plowed snow in winter and drove garbage trucks. DSOF ¶ 38. Pool MTDs normally met at a central location before going out to pick up other garbage truck workers. [65-2] at 4, 24. Plaintiff claims that Defendant often assigned him to start at different garages in the morning, while allowing white employees of similar seniority to report to the same location each day. *Id.* at 7. In his deposition, Plaintiff described receiving his assignments from Steve Tate, his supervisor, each night before the next day's shift. *Id.* at 10. Plaintiff believed the assignments originated from City Hall. *Id.* Accordingly, Plaintiff contacted Batorksi, now Deputy Commissioner of DHR, to complain, believing that Tate had "no power" over his assignments. *Id.*

### E. Alleged Retaliation

Plaintiff alleges that Defendant decided to terminate him in retaliation for protected activity. DSOF ¶ 55. Specifically, Plaintiff engaged in protected activity when he complained to Batorski about alleged racial discrimination. *See* [65-2] at 9. First, Plaintiff claims that he personally delivered a written complaint regarding his assignments to Batorski. *Id.*; DSOF ¶¶ 26, 62. The record remains unclear as to the timeline of Plaintiff's interactions with Batorski, *see, e.g.*, [65-2] at 7–10, but Plaintiff says that he spoke to Batorski after receiving an assignment to begin a

shift at O'Hare International Airport in December 2013, a few months after he was rehired, *id*. at 9. Plaintiff felt his assignments were discriminatory because they sent him to locations all around Chicago, while white employees reported to the same starting location every day. *See id*. at 7, 9. According to Plaintiff, after their conversation, Batorski told Plaintiff that he could report to a central location instead of going to O'Hare. *Id*. at 10. Nothing in the record shows that Defendant took any adverse action against Plaintiff from December 2013 until his eventual termination in July 2014.

In June 2014, approximately one month before Plaintiff's discharge, DHR received a Freedom of Information Act (FOIA) request from the Chicago Sun-Times for work histories of approximately 13 people, including Plaintiff. DSOF ¶ 40. Upon conducting a search for these work histories, DHR realized that Plaintiff was on the IFR list, yet working for the City at DSS. *Id*. Owen then reviewed Plaintiff's work history, underlying termination paperwork, and the 2006 OIG report to make sure Plaintiff belonged on the IFR list. *Id*. ¶ 44.

At this point, Owen requested a report comparing employee work histories to the IFR list to determine if any other current City employees had been coded IFR. *Id*. ¶ 45. The report identified four such employees, including Plaintiff. *Id*. The other three were Arthur Jones—another pool MTD with DSS—and two City Council employees: Thomas Sadzak and Jesse Smart. *Id*.

Plaintiff suggests that Owen did not adequately inquire into the validity of Plaintiff's status on the IFR list, alleging that Owen did not recall what particular

termination paperwork he reviewed and could not remember if he reviewed the OIG report. R. DSOF ¶ 44. But Plaintiff does not dispute that Owen reviewed Plaintiff's work history, which contained a code flagging him as ineligible for rehire, or that Plaintiff's termination paperwork contained the OIG report, which provided factual support for his termination. *See* [65-6] at 98, 101, 102.

In early July 2014, a few weeks before Defendant fired Plaintiff, Plaintiff called Batorski to complain about being sent to different garages, unlike white employees of similar seniority. DSOF ¶ 62; PSAF ¶ 16. Batorski does not recall Plaintiff complaining that he was being sent to other garages, or that white employees did not receive similar assignments. [65-7] at 119.

On July 11, Carolyn Mulaney, DHR's FOIA Officer, sent Plaintiff a letter to inform him that "DHR received an Illinois FOIA request for [his] disciplinary history," and that his work history (including his previous discharge) would be provided to the requesting party. DSOF ¶ 42.

Plaintiff claims that racial discrimination prompted Defendant's investigation into his disciplinary file, because his initial discipline and status on the IFR list arose from mere allegations of misconduct for which he was never criminally prosecuted. *Id*. ¶ 51; R. DSOF ¶ 51; PSAF ¶ 1; [65-2] at 51. Defendant states that the Sun-Times' FOIA request prompted the investigation into Plaintiff's disciplinary file. DSOF ¶ 40. The parties do not dispute the existence or timing of the Sun-Times' FOIA request. *See* R. DSOF ¶ 40. DHR Deputy Commissioner Owen testified that when DHR receives a FOIA request, the Personnel Record

Review Act mandates that DHR send a letter to the employee to inform him of the request. DSOF ¶ 14; *see also* 820 ILCS 40/7, 40/11. This rule is the reason Mulaney sent Plaintiff the July 11 letter. *See* DSOF ¶ 14.

About two weeks before Plaintiff's termination and after Plaintiff received Mulaney's letter, Plaintiff called Batorski again to ask why he had received the letter. [65-2] at 7, 11. Plaintiff wanted to know why Sadzak, the City Council employee whose status on the IFR list was also revealed by the FOIA request, did not get a similar letter. *Id.* at 37. Batorski explained that the Personnel Record Review Act required the letter notifying him of the FOIA request. DSOF ¶ 59. Batorski told Plaintiff she could not speak to him about other employees and referred him to the OIG if he wanted to make a formal complaint. *Id.* ¶ 60; [65-7] at 123. Batorski does not recall Plaintiff mentioning Sadzak's race in this phone call and says that she did not know Sadzak's race. DSOF ¶ 60.

### F.   Plaintiff's Second Termination

Once DHR identified the employees on the IFR list currently employed by the City, Owen, Batorski, and DHR Commissioner Soo Choi recommended to DSS Commissioner Charles Williams that he discharge Plaintiff and Jones. DSOF ¶ 46. Owen knew Plaintiff's race when he recommended Plaintiff's termination, but states that race did not factor into his decision. [65-5] at 105–07. On July 24, 2014, Williams informed Plaintiff that he was terminated, effective at the close of business that day, and that he was ineligible for rehire. DSOF ¶ 47.

Defendant states that Plaintiff's termination resulted from an administrative oversight of his previous placement on the IFR list. *Id.* ¶ 43. According to Owen, Plaintiff's rehiring was a mistake: Defendant simply failed to notice Plaintiff's status on the IFR list. *Id.*; [65-6] at 131. Plaintiff disputes this characterization, arguing that Owen was not involved in Plaintiff's rehiring in 2012, so his account is speculative. R. DSOF ¶ 43. Owen admits that he did not participate in Plaintiff's rehiring. [65-6] at 131. As DHR Deputy Commissioner since 2011, however, Owen testified based upon his knowledge of the City's past and present hiring practices, including for the period of Plaintiff's second hiring. *See id.* at 6. Specifically, in his deposition, Owen described a shift from manual to electronic screening of employment applications to account for Defendant's failure to notice Plaintiff's inclusion on the IFR list. *See id.* at 129–31. In any event, Plaintiff admits that, after his disciplinary history came to light in 2014, Owen reviewed DHR's files to confirm that Plaintiff was on the IFR list; Plaintiff also admits that he was, in fact, on the IFR list at this time. *See* DSOF ¶¶ 40–45; R. DSOF ¶¶ 44, 45.

Plaintiff also claims that DSS Commissioner Williams lacked the discretion to fire Plaintiff, and suggests that the decision was made fully by Owen, Batorski, and Choi. R. DSOF ¶ 46. In support, Plaintiff cites a July 31 memo from Batorski to another DHR Deputy Commissioner, stating that DHR "required" DSS to terminate Plaintiff and Jones (as opposed to merely recommending termination). [69-1] at 9. Defendant asserts that the final decision to terminate Plaintiff rested with the head of the executive department that employed him; namely, Williams.

*See* [65-4] ¶¶ 1, 4, 7.  In a sworn declaration, Williams stated that as the head of DSS, he is responsible for hiring and firing employees.  *Id.* ¶ 1.

Williams also stated that DHR *recommended* that Plaintiff be terminated because he was ineligible to hold City employment.  *Id.* ¶ 5.  Williams described himself as the final decision-maker with respect to Plaintiff's discharge from DSS in July 2014.  *Id.* ¶ 7.  Williams did not know Plaintiff's race when he discharged Plaintiff in July 2014.  *Id.* ¶ 8.  Williams also terminated Jones (the other DSS employee on the IFR list) the same day as Plaintiff.  DSOF ¶ 49.  Both Williams and Jones are African-American.  *See* [65-4] ¶ 3; [67] at 16.

The entirety of Plaintiff's protected activity prior to his termination consists of his alleged complaints to Batorski upon receiving notice of the FOIA request, and his complaints to Batorski and Tate about being sent to different yards or garages.  *See* R. DSOF ¶ 64.  Williams states that when he fired Plaintiff, he did not know of Plaintiff's complaints.  [65-4] at 2, ¶ 9.  Owen also states that he was unaware that Plaintiff made any discrimination claims before his discharge.  [65-5] at 81.

## G.    Similarly Situated Employees

In addition to Plaintiff, Defendant's response to the Sun-Times' FOIA request turned up the names of three other government employees on the IFR list: Jones, Sadzak, and Smart.  DSOF ¶ 45.  Sadzak and Smart had been previously employed by DSS and were later hired by the City Council as staff assistants.  *Id.* ¶¶ 71, 73.  DSS is an "executive department" of Chicago, meaning a department that forms part of the City's executive branch.  *See id.* ¶ 9.  The City Council is, obviously, not

part of the City's executive branch. *See id.* ¶¶ 8, 71; City of Chicago, *City Council, Your Ward & Alderman*, https://www.cityofchicago.org/city/en/about/council.html (last visited Mar. 22, 2018).[2]

Plaintiff claims that Sadzak, who is white, received more favorable treatment because Defendant did not terminate him despite his presence on the IFR list. *See* DSOF ¶ 51. Plaintiff claims that he heard from other City employees that Sadzak never received a letter about the FOIA investigation. *Id.* ¶ 57. Sadzak has not been employed by any executive department of the City of Chicago since he resigned in lieu of termination from DSS in October 2005. *Id.* ¶ 71. In November 2008, Sadzak worked for a member of the City Council as a legislative aide, and in July 2010, he became a staff assistant to a city alderman. *Id.* ¶¶ 8, 71. Sadzak was fired from that position in September 2014 and has not been employed by the City Council or by an executive department of the City since that time. *Id.* ¶ 72.

Smart has not worked in any executive department of the City since he resigned in lieu of discharge from DSS around March 2007. *Id.* ¶ 73. After his resignation, Smart worked for a member of the City Council as a staff assistant. *Id.* Smart is African-American. *Id.* ¶ 67.

In a footnote to his brief, Plaintiff also mentions John Ardelean, a white police officer whom the Chicago Police Board fired in March 2012 after finding that he was intoxicated when involved in an off-duty car crash that killed two civilians.

---

[2] This Court may take "judicial notice of public records and government documents, including those available from reliable sources on the Internet." *Sleeter v. Actavis Totowa, LLC*, No. 10-653-GPM, 2010 WL 3781261, at *2 n.1 (S.D. Ill. Sept. 21, 2010) (citing *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002)).

*See* [68] at 5 n.6; PSAF ¶ 6. Plaintiff alleges that Ardelean was placed in the "one-year" section of the IFR list by DHR (meaning that Ardelean was only temporarily ineligible for rehire), but offers no evidence to support this claim, other than to show that Ardelean was hired by the City's water management department around July 2014. PSAF ¶ 6. In any event, despite Plaintiff's cursory reference to Ardelean, *see* [68] at 5, Plaintiff's counsel confirmed in open court on March 21, 2018, that Sadzak and Smart are the only proposed comparators offered at this point in the case.

### H.   This Case

In September 2014, Plaintiff filed an Equal Employment Opportunity Commission (EEOC) charge, alleging that his 2014 termination constituted racial discrimination. DSOF ¶ 4. In October, Plaintiff filed another charge alleging that Defendant fired him because of his complaints of discrimination. *Id.* ¶ 6. Plaintiff received notice of his right to sue and initiated this action in December 2014. [1]; [26] at 2, 9, 14. Plaintiff amended his complaint in October 2015, alleging unlawful discrimination and retaliation in violation of Title VII. [26]. This opinion addresses Defendant's motion for summary judgment on both counts. [66].

## II.   Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary

judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III.  Analysis

Plaintiff claims that Defendant terminated him because of his race and in retaliation for protected activity in violation of Title VII. [26]. Title VII prohibits employers from discriminating against employees on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a); *see also Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007). Title VII also bars employers from retaliating against employees who engage in protected activity by exercising their Title VII rights. *See Poullard v. McDonald*, 829 F.3d 844, 855–56 (7th Cir. 2016); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 53 (2006).

In the Seventh Circuit, courts addressing Title VII claims consider all relevant evidence "as a whole," without separating "direct" and "indirect" evidence. *Ortiz v. Werner Enters.*, 834 F.3d 760, 763 (2016). Courts must ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765.

The Seventh Circuit's decision in *Ortiz*, however, did not alter the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 766. As a result, courts addressing discrimination claims now conduct the *McDonnell Douglas* analysis if the parties present arguments "in those terms," but also assess the plaintiff's evidence "cumulatively" to determine "whether it permits a reasonable factfinder" to conclude that the challenged employment action was attributable to a proscribed factor. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Because the parties employ *McDonnell Douglas*, this Court first addresses Plaintiff's claims in those terms and then assesses the evidence under *Ortiz*'s holistic approach. *See id.*

## A. Count I: Race Discrimination

### 1. *McDonnell Douglas* Analysis

Plaintiff claims that Defendant terminated him in 2014 because of his race.[3] [26] at 2. Plaintiff alleges that Defendant's proffered reasons for his termination

---

[3] Plaintiff appears to suggest in his brief that his claim encompasses allegations of discrimination *during* his employment, in addition to his allegedly discriminatory termination. *See* [68] at 5. But Plaintiff's complaint (and preceding EEOC charge) asserts a claim based solely upon his termination. *See* [26] at 2–3. In any event, Plaintiff does not develop or substantively pursue a claim for

constitute pretext for discrimination. [68] at 6–7. Defendant contends that it fired Plaintiff because of its discovery of Plaintiff's inclusion on the IFR list. *See* [67] at 2, 12. Defendant seeks summary judgment on the grounds that Plaintiff lacks any direct evidence of race discrimination, fails to establish a prima facie case of discrimination under *McDonnell Douglas*, and in any event cannot show that Defendant's reasons for firing Plaintiff constitute pretext. *See id*. at 7, 8, 11.

Plaintiff does not offer any direct evidence of discrimination, but argues that he has established his prima facie case under *McDonnell Douglas*. *See* [68] at 4–5. *McDonnell Douglas* requires Plaintiff to state a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) at the time of his termination, he was performing reasonably on the job in accordance with Defendant's legitimate expectations; (3) despite his reasonable performance, he was subjected to an adverse employment action; and (4) similarly situated employees outside of his protected class received more favorable treatment. *See Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765. If Plaintiff states a prima facie case, then Defendant "must articulate a legitimate, nondiscriminatory reason" for his termination, at which point the burden reverts to Plaintiff to show that Defendant's explanation is pretextual. *Id*. An inquiry into pretext requires evaluating "the honesty of the employer's explanation, rather than its validity or reasonableness." *O'Leary v. v. Accretive Health, Inc.,* 657 F.3d 625*,* 636–37 (7th Cir. 2007).

---

discriminatory acts during his employment in his brief, *see* [68] at 5, and thus waives such "perfunctory and undeveloped arguments." *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016).

The parties agree that Plaintiff belongs to a protected class, satisfying the first element of his prima facie case. *See* [67] at 8. Plaintiff also meets the third prong of *McDonnell Douglas* because termination constitutes a materially adverse employment action. *Lewis,* 496 F.3d at 653. Defendant contends, however, that Plaintiff fails to meet the second and fourth prongs because Plaintiff fails to show that he met Defendant's legitimate expectations or that Defendant treated similarly situated employees more favorably. [67] at 8.

### i.  Legitimate Employment Expectations

Ordinarily, for a plaintiff to successfully state a prima facie case of discrimination, he must show that he met his employer's legitimate expectations. *Andrews*, 743 F.3d at 234. But the Seventh Circuit has held that this "flexible" inquiry "may be unnecessary" when "the issue is whether the plaintiff was singled out for discipline based on a prohibited factor." *Ismail v. Brennan*, 654 F. App'x 240, 243 (7th Cir. 2016) (internal quotation marks omitted). In other words, even if a plaintiff failed to meet "his employer's legitimate expectations, he can still establish a prima facie case" if his employer "applied its expectations against him in a discriminatory manner." *Dossiea v. Bd. of Educ. of City of Chi.*, No. 07-c-1124, 2008 WL 4133418, at *4 (N.D. Ill. Aug. 22, 2008) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)). Thus, if "a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge." *Peele*, 288 F.3d at 329.

Here, neither party claims that Plaintiff's termination related to his job performance. *See* [67] at 7–8; [68] at 4–5. Rather, Defendant contends that Plaintiff could not possibly meet its legitimate expectations because they encompassed eligibility for employment, and Plaintiff's inclusion on the IFR made him ineligible to work for the City. *See* [67] at 7–8; DSOF ¶¶ 18–19, 43; [65-3] at 26, 28–29, 51–52; [65-6] at 147.

Perhaps unsurprisingly, little case law exists on how such an error in hiring interacts with the legitimate expectations inquiry. But in somewhat analogous cases where plaintiffs allege that an employer unlawfully failed to hire or promote them, plaintiffs have the burden of showing that they were qualified for the desired position. *See Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1045 (7th Cir. 2000); *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir. 1998); *see also Kralman v. Ill. Dep't of Veterans' Affairs*, 23 F.3d 150, 153 (7th Cir. 1994) (noting the "inevitable" adaptation of legal standards across discrimination cases, "given the various types of employment action—i.e., hiring, demotions, discharges—that may be at issue"). Other courts have found that ineligibility for a position constitutes a "legitimate, non-discriminatory reason for terminating an employee." *See McNeil v. Command Ctr., Inc.*, No. 8:09-cv-60, 2011 WL 666255, at *3 (D. Neb. Feb. 14, 2011) (citing *EEOC v. Trans State Airlines, Inc.*, 462 F.3d 987 (8th Cir. 2006)); *see also Franklin v. Flowserve FSD Corp.*, No. 6:14-cv-40, 2015 WL 6756921, at *9 (W.D. Va. Nov. 5, 2015). Finally, some courts have found that the "legitimate expectations" prong of *McDonnell Douglas* incorporates an inquiry into whether the plaintiff was "qualified

for the position." *Meads v. Dixie Consumer Prods., LLC*, No. 5:08-507, 2010 WL 3168091, at *7 (E.D. Ky. Aug. 10, 2010) (citing *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008)); *see also Franklin*, 2015 WL 6756921, at *6.

Following that persuasive precedent, this Court concludes that Plaintiff failed to meet Defendant's legitimate expectations because his actions placed him on the IFR list and he was thus ineligible for the position for which he was mistakenly hired. *See Darbha v. Capgemini Am., Inc.*, No. 10-c-2581, 2012 WL 718826, at *6 (N.D. Ill. Mar. 6, 2012) (merging the failure to hire and termination analyses and finding that the plaintiff did not meet his employer's expectations where "he was not qualified" for any open positions after his initial assignment ended). Absent facts not present here, this Court cannot second-guess Defendant's use of the IFR list, because it is not "the province of the court to determine whether" Defendant's expectations were "fair, prudent, or reasonable," so long as they were nondiscriminatory. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464–65 (7th Cir. 2014). Thus, Plaintiff "cannot create a factual dispute" by arguing that Defendant *should* have retained him despite its policy to deny employment to individuals on the IFR list; if Plaintiff did not meet Defendant's facially legitimate criteria, then he failed to meet Defendant's legitimate job expectations. *See id*.

Plaintiff does not directly contest the validity of the IFR list or Defendant's policies. Instead, he argues that his initial placement on the IFR list was racially motivated, and that Defendant did not fire other employees it discovered were on the IFR list. *See* R. DSOF ¶ 28; [68] at 4. This Court discusses the latter argument

in the next section, addressing whether those employees were similarly situated to Plaintiff. As to Plaintiff's initial placement on the IFR, Plaintiff fails to show that Defendant improperly placed him on the list.

Plaintiff claims that Defendant has no evidence to support the OIG's finding that Plaintiff unlawfully possessed a stolen U-Haul. R. DSOF ¶ 28. This argument borders upon the frivolous, since the OIG report constitutes competent evidence, as does the report from the Personnel Review Board that reviewed Plaintiff's first termination. *See* Fed. R. Evid. 803(8)(B); *see also Hawk v. Bd. of Educ. of City of Chi.*, No. 04-c-4263, 2007 WL 844578, at *11–12 (N.D. Ill. Mar. 15, 2007) (relying upon OIG report as evidence of misconduct prompting plaintiff's termination); [65-5] at 124–25; [65-7] at 186–96. The OIG report includes Plaintiff's admission—from an interview with OIG investigators—that he knowingly drove a stolen U-Haul. [65-5] at 124. As stated in the OIG report, this behavior violated the City's personnel rules. *See* [65-5] at 125. The Personnel Board affirmed the OIG's findings and further found that the City proved Plaintiff's misconduct by a preponderance of evidence at the February 2007 hearing. *See* [65-7] at 186–87.

Plaintiff argues that because he was not *convicted* of this crime it cannot support his termination or his placement on the IFR list. *See, e.g.*, R. DSOF ¶ 28. But Plaintiff's unlawful conduct still violated the personnel rules, which prohibit any *illegal* acts by City employees, regardless of whether a prosecutor obtained a conviction beyond a reasonable doubt in any criminal proceeding. *See* [65-3] at 51,

55. Plaintiff does not—and cannot—dispute that these rules applied to him as a City employee under DSS. *See* DSOF ¶¶ 28-30; [65-3] at 13.

Plaintiff also contends that the OIG's finding that he violated personnel rules by omitting a conviction from his 1998 job application failed to provide grounds for his termination or inclusion on the IFR list. *See* R. DSOF ¶ 28. Plaintiff contends that because the omitted conviction had been expunged, his failure to disclose it could not be improper. *See id.* But the application asked, without qualification, if the applicant had "*ever* been convicted of any crime." *See* [65-5] at 124 (emphasis added). And the personnel rules prohibit failing to disclose "*any* information requested," or providing a "misleading answer," in any City employment application. *Id.* at 125 (emphasis added). Plaintiff does not explain how an expunged conviction falls outside the broad disclosure required by the City's job application and personnel rules. *See* R. DSOF ¶ 28; [68].

In sum, Plaintiff fails to show that his initial termination or placement on the IFR list was improper. It remains Plaintiff's burden to show that he met Defendant's legitimate expectations. *See Andrews*, 743 F.3d at 234; *Harney*, 526 F.3d at 1104. Without facts to rebut Defendant's evidence of a legitimate policy that Plaintiff violated, and Plaintiff's subsequent ineligibility for his position under such policy, Plaintiff fails to meet his burden. *See Widmar*, 772 F.3d at 463–64; *Franklin*, 2015 WL 6756921, at *6, 9; *Darbha*, 2012 WL 718826, at *6.

But Plaintiff also claims that Defendant applied its rules discriminatorily by failing to include a white employee on the permanent IFR list despite similar

misconduct, and by failing to terminate other employees it later discovered to be on the IFR list. *See* [68] at 4–5. This Court therefore must also consider whether Defendant treated similarly situated employees more favorably in applying its disciplinary procedures, which overlaps with the legitimate expectations prong in the face of such allegations. *See Peele*, 288 F.3d at 329.

### ii.    Similarly Situated Employees

To survive summary judgement under *McDonnell Douglas*, plaintiffs must show that "at least one similarly situated employee, outside of their protected class, was treated more favorably than they were." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). To qualify as similarly situated, the proffered comparator must be "directly comparable" to the plaintiff "in all material respects." *Id*. The similarly-situated determination requires a "common-sense" analysis of relevant factors, including whether the other employee "held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Id.* (internal quotation marks omitted). Whether a comparator is similarly situated is often a question of fact, but this Court may decide it at summary judgment if "no reasonable fact-finder could find" that Plaintiff meets his "burden on the issue." *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012). Because Plaintiff claims that Defendant disciplined him more harshly than other employees based upon a prohibited factor, he must show that his comparators are similar "with respect to performance, qualifications, and conduct." *Dossiea*, 2008 WL 4133418, at *5 (internal quotation marks and alterations omitted).

With respect to his inclusion in the permanent, rather than temporary, IFR list, Plaintiff ostensibly referenced Ardelean (the police officer placed on the temporary IFR list) as a comparator. *See* PSAF ¶ 6; [68] at 4. But Ardelean was a police officer, not a pool MTD or any kind of DSS employee; he is therefore not "directly comparable" to Plaintiff and cannot serve as a comparator. *Alexander*, 739 F.3d at 981; *see also Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001) (finding that employee was not similarly situated where he and the plaintiff "did not hold the same or equivalent positions" in the relevant period). In any event, this Court accepts Plaintiff's representation in open court that Plaintiff does not offer Ardelean as a comparator at summary judgment.[4]

With respect to Plaintiff's 2014 termination, Plaintiff's proffers two City Council employees as comparators: Sadzak and Smart. *See* [68] at 4–5; [26] at 12.[5] But Sadzak and Smart not only possess different jobs with different duties from Plaintiff, they also worked for the City Council, a separate entity from the executive branch of the City of Chicago, in which DSS exists. *See* DSOF ¶¶ 24, 67, 71–73. Plaintiff has failed to show that, despite their distinct titles and employers, Sadzak and Smart somehow remain "subject to" the same "standards" as Plaintiff or engaged in "similar conduct." *Coleman,* 667 F.3d at 848. Furthermore, Smart is also African-American, and thus ineligible as a comparator because he falls within

---

[4] The same goes for Jones, who is also African-American and thus cannot serve as a comparator since he falls within the same protected class as Plaintiff. *See Alexander*, 739 F.3d at 981; [67] at 16.

[5] In his response brief, Plaintiff also claims that Defendant has rehired or removed from the IFR list "other former employees," but does not name them, develop this argument, or cite to any authority. [68] at 4. He waives such "perfunctory and undeveloped arguments." *Crespo*, 824 F.3d at 674.

Plaintiff's protected class. *See* DSOF ¶ 67; *Alexander*, 739 F.3d at 981. Thus, Plaintiff fails to show that either Smart or Sadzak constitute valid comparators.

Because Plaintiff fails to show that Defendant treated any similarly situated employee more favorably, he fails to prove his prima facie case under *McDonnell Douglas*. *See Peele*, 288 F.3d at 331. Accordingly, this Court need not proceed to the pretext inquiry. *Id*. at 326–27, 331.

## 2. *Ortiz* Analysis

This Court's conclusion does not change under *Ortiz*'s holistic approach. Under *Ortiz*, this Court must assess Plaintiff's evidence cumulatively, and ask whether it would permit a "reasonable factfinder to conclude" that his race caused his termination. *Ortiz*, 834 F.3d at 765; *see also David*, 846 F.3d at 224. Based upon this record, it would not. Plaintiff's evidence raises no reasonable inference that improper motives drove Defendant's actions. He fails to call into question Defendant's well-documented reasons for his 2006 discharge, his inclusion on the IFR list, and his 2014 discharge based upon his ineligibility for employment. Other than his own "subjective beliefs," Plaintiff provides no evidence that any of the decision-makers involved in his termination acted upon any racial animus, nor do the events around his termination show a discriminatory reason for his firing. *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 669 (N.D. Ill. 2016) (applying *Ortiz*).

Instead, the record shows that DSS acted in response to a FOIA request, and, based upon a subsequent investigation, Defendant realized that Plaintiff and Jones

were on the IFR list and terminated both of them. Although a pattern of treating members of a protected class unfavorably can provide circumstantial evidence of discrimination, *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007), no such pattern exists here. The record contains no evidence that any white DSS employees—or any DSS employees other than Plaintiff and Jones—were on the IFR list, yet kept their jobs. Thus, although both Plaintiff and Jones are African-American, the record does not show any disparate treatment based upon race; rather, their ineligibility provides "an independent and a legally permissive basis" for their termination. *Id.*

Because no reasonable jury could conclude that Plaintiff's race caused his termination, *Ortiz*, 834 F.3d at 765, this Court grants summary judgment to Defendant on Plaintiff's discrimination claim, *see Anderson*, 477 U.S. at 252.

### B.    Count II: Retaliation

Plaintiff alleges that Defendant fired him in 2014 because he engaged in protected activity and that Defendant's reasons for his termination are pretext for retaliation. *See* [68] at 5. Defendant alleges that its rediscovery of Plaintiff's status on the IFR list prompted his 2014 discharge and seeks summary judgment on the grounds that Plaintiff fails to show otherwise. *See* [67] at 13, 16.

As with discrimination claims, courts evaluating retaliation claims before *Ortiz* proceeded on two tracks: the direct and indirect methods of proof. *See, e.g.*, *Anderson v. Donahoe*, 699 F.3d 989, 994–95 (7th Cir. 2012). The direct method required plaintiffs to show: (1) protected activity; (2) a materially adverse action by

their employer; and (3) "a causal connection between the two." *Id*. at 995. The indirect method required plaintiffs to "establish a prima facie case of retaliation by demonstrating that after engaging in protected activity such as filing a charge," they were "subjected to an adverse employment action" despite performing satisfactorily, and "no similarly situated employee who did not file a charge was subjected to the adverse employment action." *Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2005). The latter method followed the *McDonnell Douglas* burden-shifting framework. *See id*. at 984.

Because *Ortiz* applies to Title VII retaliation claims, *see Williams v. Office of Chief Judge of Cook Cnty.*, 839 F.3d 617, 626 (7th Cir. 2016), and the parties frame their arguments according to the direct method of proof, this Court considers the evidence in those terms before focusing upon "the more general inquiry of whether a reasonable jury could find" that Defendant terminated Plaintiff in retaliation for protected activity, *Harris v. Chi. Transit Auth.*, No. 14-c-9106, 2017 WL 4224616, at *4–5 (N.D. Ill. Sept. 22, 2017); *see also David*, 846 F.3d at 224.

## 1.    Direct Method

Although his brief lacks clarity, Plaintiff appears to frame his retaliation claim in terms of the old "direct method of proof." *See* [68] at 5 (citing *Malin v. Hospira*, 762 F.3d 552, 558–59 (7th Cir. 2014) (applying the direct method of proof)). As noted above, to survive summary judgment under the direct method, Plaintiff must show that: (1) he "engaged in a statutorily protected activity"; (2) he suffered a materially adverse employment action; and (3) "there was a causal link between the

two." *Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 664 (7th Cir. 2011) (internal quotation marks omitted).  This Court addresses each element in turn.

### i.     Statutorily Protected Activity

Statutorily protected activity includes making substantive complaints "to an employer about impermissible discrimination." *Eskridge v. Chi. Bd. of Educ.*, 47 F. Supp. 3d 781, 794 (N.D. Ill. 2014) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)); *see also Malin*, 762 F.3d at 558.  Taking all inferences in Plaintiff's favor, *Trebatoski*, 743 F.3d at 528, this Court credits Plaintiff's claim that he raised the issue of discrimination with Batorski in sufficient detail to constitute protected activity in December 2013 and July 2014, *see Tomanovich*, 457 F.3d at 663; [65-2] at 9–11.  Thus, for the purposes of this motion, Plaintiff satisfies the first prong of the direct method.  *Benuzzi,* 647 F.3d at 664.

The parties do not dispute that Plaintiff's firing constitutes an adverse employment action.  *See* [67] at 13–15.  This Court therefore proceeds to the causation inquiry.

### ii.     Causation

To satisfy the causation requirement, the "protected activity of an employee making a retaliation claim must have been 'a but-for cause of the alleged adverse action by the employer.'" *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)). This requires showing that "the adverse action would not have happened without the activity." *Id.*  Plaintiff may rely "on either direct or circumstantial evidence" to

demonstrate Defendant's retaliatory motive. *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 307 (7th Cir. 2012). Circumstantial evidence of retaliation includes "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Hobgood v. Ill. Gaming Bd.,* 731 F.3d 635, 643 (7th Cir. 2013) (internal quotation marks omitted). But mere "temporal proximity" between the statutorily protected activity and the allegedly retaliatory action rarely suffices "in and of itself to create a triable issue." *Harper*, 687 F.3d at 308 (internal quotation marks omitted).

Plaintiff's first instance of protected activity occurred in December 2013, when he spoke with Batorski about being assigned to work at O'Hare. *See* [65-2] at 9–10. Plaintiff talked to Batorski again in July 2014, first to complain about his allegedly discriminatory assignments, and then to ask about the notice he received from Mulaney about DSS releasing his work history. *See id.* at 10–11. The close temporal proximity between Plaintiff's July 2014 complaints to Batorski and his termination a few weeks later, *see id.*, could constitute circumstantial evidence of retaliation, *see Hobgood,* 731 F.3d at 643. But suspicious timing does not, absent more, support "the inference of a causal link." *Anderson v. Donahoe*, 699 F.3d at 996. Instead, Plaintiff must "produce facts which somehow tie the adverse decision" to his protected activity. *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). Plaintiff fails to do so here.

Plaintiff's only argument other than this allegedly suspicious timing is that Defendant's rationale for his firing—his inclusion on the IFR list—was pretextual because Defendant's personnel rules did not "require" his termination, and therefore Batorski—who wrote in a memo that his termination *was* "required"— acted upon racial animus. *See* [68] at 6–7. While it is technically true that Defendant's personnel rules do not contain an express condition that requires employees on the IFR list to be fired, such an omission possesses little probative value since individuals on the IFR list *should not be hired in the first place.* *See* DSOF ¶¶ 34, 43–47. Plaintiff does not dispute that he had been placed on the IFR list, *see, e.g.*, R. DSOF ¶ 43, and this Court has already rejected his arguments that his inclusion on the list was improper. Nor does Plaintiff rebut Defendant's evidence that it hired him in error, having failed to notice his IFR status. *See* DSOF ¶¶ 34, 43–47. Batorski's use of the word "require" may not have reflected the letter of the personnel rules, but it properly conveyed the factual matter that Plaintiff remained ineligible for the position he currently held. *See id.*; *see also* [69-1] at 9. That fact provided legitimate grounds for Plaintiff's immediate termination. *See Franklin*, 2015 WL 6756921, at *9; *McNeil*, 2011 WL 666255, at *3.

Plaintiff argues that Defendant's proffered grounds constitute pretext because of purported bias on Batorski's part. *See* [68] at 7. But Plaintiff offers nothing more than speculation about any such bias, *see id.*, which does not constitute evidence and cannot stave off summary judgment, *see Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016). Moreover, contrary to Plaintiff's assertion, Batorski

was not the sole decision-maker regarding Plaintiff's termination. *See* [68] at 7. Rather, Owen undertook the review of employees on the IFR list, and consulted with Batorski, Choi, and Williams about Plaintiff's termination; and ultimately, Williams issued the final decision. *See* DSOF ¶¶ 43–47. Plaintiff offers no allegations of bias against Owen, Choi, or Williams. The presence of multiple decision-makers often makes it "difficult" to prove that an employer's action is discriminatory, and here, Plaintiff does not even attempt to show that each of these individuals possessed an illicit intent to retaliate against him. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 508 (7th Cir. 2004).

Finally, even the purportedly suspicious timing of Plaintiff's termination fails withstand summary judgment. A "significant intervening event" that separates the "complaints from the discharge" can negate an inference of causality. *Davis v. Time Warner,* 651 F.3d 664, 675 (7th Cir. 2011). In *Davis*, that intervening event occurred when the plaintiff violated his employer's workplace policies. *See id*. Here, that event occurred when the Sun-Times filed a FOIA request, bringing Plaintiff's ineligibility for employment to Defendant's attention. *See* DSOF ¶ 46. Plaintiff offers no evidence to undermine that chain of events, and, as discussed above, fails to point to any similarly situated employee that Defendant failed to terminate, further negating any inference of retaliation. *See Davis*, 651 F.3d at 675.

In sum, Plaintiff fails to meet his burden of showing that his protected activity causally relates to his termination. *Id*. at 674. Based upon the record, "no

reasonable jury could cross the evidentiary chasm separating" Plaintiff's protected activity from his termination. *Id*. at 675.

### 2. *Ortiz* Analysis

This Court's analysis does not change under *Ortiz*'s holistic approach. As should be clear from the foregoing discussion, Plaintiff lacks the evidence to support his retaliation claim. Based upon the record, no reasonable jury could conclude that Plaintiff's complaints to Batorski motivated his termination. *See Ortiz*, 834 F.3d at 765. Thus, this Court grants Defendant summary judgment on Plaintiff's retaliation claim. *See Anderson*, 477 U.S. at 252.

## IV. Conclusion

This Court grants Defendant's motion for summary judgment [66]. Judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's complaint. All other dates and deadlines are stricken. Civil case terminated.

Dated: March 27, 2018

Entered:

John Robert Blakey
United States District Judge
